UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RICHARD FERREIRA,
    *Plaintiff,*
v.

TOWN OF LINCOLN, et al.,
    *Defendants.*

C.A. No. 1:19-cv-000200-JJM-PAS

**LINCOLN DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

**I.**    **INTRODUCTION**

*Pro se* Plaintiff Richard Ferreira ("Plaintiff") has filed a Second Amended Complaint alleging multiple claims against several Defendants, including the Town of Lincoln ("Town"), the Lincoln Police Department ("Police Department"), Chief of Police Brian Sullivan ("Sullivan"), Captain Philip Gould ("Gould"), and Detective Sean Gorman ("Gorman"). The Second Amended Complaint replaces Plaintiff's First Amended Complaint, which, in addition to the above-mentioned parties, also named Detective Lieutenant Dana Packer ("Packer"); Sergeants Christopher Nightingale ("Nightingale"), Jason Bolduc ("Bolduc"), and Walter Ptaszek ("Ptaszek"); and Patrol Officers Stephen Rodrigues ("Rodrigues"), Joseph Anterni ("Anterni"), Brendan Legare ("Legare"), Kyle Kinniburgh ("Kinniburgh"), and Jonathon Sexton ("Sexton") (collectively the "Lincoln Defendants"). The Second Amended Complaint brings five "Legal Claims," all of which contain allegations that the Lincoln Defendants, after responding to an incident in which Plaintiff was shot, improperly seized a Mercedes SUV ("Mercedes") purportedly belonging to Plaintiff and $67,000 purportedly contained therein.[1] However, Plaintiff has

---

[1] Specifically, "Legal Claim #1" alleges that the Lincoln Defendants "refused/violated the RIGL §21-28-5.04.1, of the RI Forfeiture law" and "refused/violated the Federal Forfeiture Laws at 21 USCS, §§853(a), and 881(d); and/or 19 USCS, §§1615." Second Amended Complaint, Docket at #46, at ¶¶ 73(A)-(B). "Legal Claim #2" alleges what Plaintiff describes as a "Tort of Negligence Action-Claim of Financial Interference" resulting from the Lincoln

1

provided no evidence to suggest that any of the Lincoln Defendants seized either the Mercedes or the money. The Lincoln Defendants, therefore, now move for summary judgment on all counts in the Second Amended Complaint.

## II.    FACTS

On April 29, 2016 at approximately 5:10 AM, Rodrigues, Sexton, Anterni, and Kinniburgh were dispatched to the Courtyard Marriott ("Marriott") at 636 Washington Highway in Lincoln in response to a report of a shooting. See Exhibit A, Defendant Kyle Kinniburgh's Response to Plaintiff's First Set of Interrogatories, at 6; Exhibit B, Lincoln Police Dept. April 29, 2016 Incident Report. Dispatch notified the officers that an African American male had left the Marriott for a Sunoco gas station next door. Exhibit A at 6. Anterni responded to the Sunoco station and saw an African American male, later identified as Gerron Harper ("Harper"), near one of the gas pumps. Exhibit C, Defendant Joseph Anterni's Response to Plaintiff's First Set of Interrogatories, at 6. Anterni drew his weapon and ordered Harper to the ground, at which time Kinniburgh arrived on scene and acted as a cover officer. Id. After Anterni placed Harper in handcuffs, he saw Isabela Silva ("Silva") running toward the Sunoco station. Id. Silva was screaming that Plaintiff, her boyfriend, had been shot at the Marriott and that the shooters were possibly still inside the hotel. Exhibit A at 6. Anterni then removed the handcuffs from Harper, determining that he was not a suspect at that time, and proceeded with Kinniburgh to the Marriott. Id.; Exhibit C at 6.

The front desk clerk at the Marriott directed Anterni and Kinniburgh to room 318. Exhibit C at 6. They directed Harper, who had followed them to the hotel, to remain in the lobby. Exhibit

---

Defendants' interference with his "right to gamble, and/or have money, and/or spend his money as he saw fit . . . ." Id. at ¶¶ 74-75. "Legal Claim #3" reiterates Plaintiff's purported claims under Rhode Island and federal forfeiture laws and also claims violations of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Id. at ¶¶ 32(F)-(M), 77. "Legal Claim #4" contains a claim for a "Willful and Malicious Tort of Conversion Of Personal Effects and $67,000.00 seized/converted/stolen from inside the SUV." Id. at ¶ 78. "Legal Claim #5" presents a claim for an "Innocent, Technical, Reckless Tort of Conversion" of the same property listed in "Legal Claim #4." Id. at ¶ 80.

A at 6.  Upon reaching the third floor, they discovered Plaintiff lying on the floor in the hallway. Exhibit C at 6.  They then cleared and secured the room, which had no occupants at the time.  Id. Sexton then arrived and encountered Harper, who was on his way to the parking lot after Anterni and Kinniburgh had advised him to remain in the lobby.  Exhibit D, Defendant Jonathon Sexton's Response to Plaintiff's First Set of Interrogatories, at 6.  Noting that Harper appeared "very animated" and fit the description of the male reported by dispatch, Sexton stopped him and asked if he was involved in the incident.  Id.  Harper stated that he was going to his car, which he described as a white Mercedes parked to the right of the entrance to the Marriott.  Id.  Sexton watched Harper walk toward a row of cars, stop, and begin pacing.  Id.  Sexton then continued on into the hotel.  Id.  He reached the third floor and saw Anterni and Kinniburgh securing the scene. Id.  He then returned to the lobby and found Harper again; Harper gave Sexton his personal information but said he did not have a phone number or an active cell phone.  Id.

Rodrigues and Legare arrived on scene around the same time as Sexton and assisted Anterni in searching the third floor, the stairwell, and a maintenance closet.  Exhibit C at 7; Exhibit E, Defendant Brendan Legare's Response to Plaintiff's First Set of Interrogatories, at 6.  Harper then returned to the third floor, at which point he became upset again.  Exhibit D at 6.  Sexton, Rodrigues, and Legare placed him in the elevator, and Sexton escorted him back to the lobby.  Id.; Exhibit C at 7.  As Rodrigues proceeded to interview three witnesses from the neighboring room, Plaintiff was transported by ambulance to Rhode Island Hospital.  Exhibit F, Defendant Stephen Rodrigues's Response to Plaintiff's First Set of Interrogatories, at 7.

Gorman arrived on scene at approximately 5:40 AM and was briefed on the situation by Kinniburgh.  Exhibit G, Defendant Sean Gorman's Response to Plaintiff's First Set of Interrogatories, at 4.  He began to process the scene and saw blood on the carpet in the hallway

and two shell casings in front of room 318. Id. After speaking briefly with Harper and Silva, Gorman began to photograph the scene; he saw more blood on the carpet and the walls, and he also saw two baggies, one empty and one containing a white, powdery substance, on a desk inside the room. Id. at 5. Sullivan then arrived on scene and told Gorman that the Rhode Island State Police ("State Police") were on their way and would take charge of the scene when they arrived. Id. In the course of his time on scene, Sullivan remained on the third floor of the Marriott. Exhibit H, Defendant Chief of Police's Response to Plaintiff's First Set of Interrogatories, at 5. Shortly after Sullivan spoke with Gorman, several State Police detectives arrived and took over the scene. Exhibit C at 7. Gould arrived on scene at around the same time as Sullivan. See Exhibit A at 7; Exhibit C at 7. He remained in the lobby, and later provided a statement to the press assembled outside the Marriott's entrance. Exhibit I, Defendant Philip Gould's Response to Plaintiff's First Set of Interrogatories, at 3.

Sexton transported Silva to the police station to be interviewed by detectives. Exhibit D at 6; Exhibit F at 7. Kinniburgh then transported Harper to the station for the same purpose, remaining with Harper in the interview room until Gorman relieved him at about 8:15 AM. Exhibit A at 7; Exhibit F at 7. Rodrigues cleared from the scene shortly after Silva and Harper were transported. Exhibit F at 7. Anterni remained and created a sign-in sheet to monitor those who entered room 318 in the course of securing and processing the scene. Exhibit C at 7. He was relieved from his post at about 2:00 PM. Id.

Gorman and another officer returned to the scene later that day and field tested a white substance seized from the hotel room by the State Police. Exhibit G at 5. The substance tested positive for heroin, and Plaintiff, Harper, and Silva were charged with possession of a controlled substance. Id.

Packer and Ptaszek neither responded to the scene nor participated in any subsequent proceedings related to the incident. Exhibit J, Defendant Dana L. Packer's Response to Plaintiff's First Set of Interrogatories, at 4, 6; Exhibit K, Defendant Walter Ptaszek's Response to Plaintiff's First Set of Interrogatories, at 5, 7. Bolduc and Nightingale likewise did not respond to the scene. Exhibit L, Defendant Jason Bolduc's Response to Plaintiff's First Set of Interrogatories, at 5; Exhibit M, Defendant Christopher Nightingale's Response to Plaintiff's First Set of Interrogatories, at 4. About a month after the incident, Bolduc reviewed and approved the narratives of Kinniburgh, Sexton, Anterni, and Rodrigues. Exhibit L at 7. At some other point subsequent to the incident, Nightingale possibly handled related court paperwork. Exhibit M at 6-7.

**III.    ARGUMENT**

    A.    *Standard of Review*

Under the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is axiomatic that this Court must view the evidence in the light most favorable to the nonmoving party. Morrissey v. Boston Five Cents Sav. Bank, F.S.B., 54 F.3d 27, 31 (1st Cir. 1995). However, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleadings, but . . . must set forth the specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The primary purpose of summary judgment is to permit the court "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required" on the claims being examined. Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 793-94 (1st Cir.

1992). The mandates of Rule 56(c) require entry of summary judgment "upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Thus, "[t]he moving party bears the initial burden of demonstrating a lack of a material issue of fact, which shifts the burden to the non-moving party, who then must show the trier of fact could rule in his favor with respect to each issue." Ferro v. R.I. DOT, 2 F. Supp. 3d 150, 156 (D.R.I. 2014) (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)).

"A fact is 'material' if it potentially could affect the suit's outcome. An issue concerning such a fact is 'genuine' if a reasonable fact finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Cortes-Iriszarry v. Corporacion Insular DeSeguros, 111 F.3d 184, 187 (1st Cir. 1997) (citations omitted). As recognized by this Court, "[a] genuine issue of fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Global Epoint, Inc. v. Gtech Corp., 58 F. Supp. 3d 178, 184 (D.R.I. 2014) (quoting Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009)) (internal citation and quotation marks omitted). But, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Ferro, 2 F. Supp. 3d at 156 (citations omitted).

> B.  *Packer, Nightingale, Bolduc, Ptaszek, Rodrigues, Anterni, Legare, Kinniburgh, and Sexton should be dismissed as parties to this matter because Plaintiff has removed all references to these Defendants in his Second Amended Complaint.*

Plaintiff's First Amended Complaint, filed with this Court on August 27, 2019, included the above-referenced parties as Defendants. See generally First Amended Complaint, Docket at #13. These parties were listed both in the caption of the First Amended Complaint and in the portion of its body entitled "Parties." Id. at Caption, ¶ 10. However, they make no appearance in the Second Amended Complaint, either in the corresponding sections or anywhere else in its body. See generally Second Amended Complaint, Docket at #46. Furthermore, Plaintiff's affidavit in support of his motion to amend expresses a desire "to *delete* or add Defendants required for proper adjudication of action," thereby indicating that he sought to remove the above-referenced parties from the instant action by omitting them in his Second Amended Complaint. Plaintiff's Renewed Motion to Amend the First Amended Complaint, Docket at #45, at 2 (emphasis added).

"An amended complaint supersedes the original complaint, and facts that are neither repeated nor otherwise incorporated into the amended complaint no longer bind the pleader." InterGen N.V. v. Grina, 344 F.3d 134, 145 (1st Cir. 2003) (internal citations omitted); see also Flannery v. Recording Indus. Ass'n of Am., 354 F.3d 632, 638 n.1 (7th Cir. 2004) ("It is axiomatic that an amended complaint supersedes an original complaint and renders the original complaint void.") (internal citations omitted). The one paragraph in the body of Plaintiff's First Amended Complaint that mentions the above-referenced Defendants has been reworded in the Second Amended Complaint to remove mention of them completely; that paragraph now only lists Sullivan, Gould, and Gorman, who are also the only members of the Lincoln Police Department listed in the caption of the Second Amended Complaint. See First Amended Complaint, Docket at #13, at ¶ 10; Second Amended Complaint, Docket at #46, at Caption, ¶ 10. The latter paragraph, therefore, has rendered the former void, and the above-referenced parties should be dismissed accordingly.

      C.      *Plaintiff does not present cognizable claims under R.I. Gen. Laws § 21-28-5.04.1, 21 U.S.C. §§ 853(a) and 881(d), or 19 U.S.C. § 1615.*

In "Legal Claim #1" of his Second Amended Complaint, Plaintiff claims that the Lincoln Defendants violated R.I. Gen. Laws § 21-28-5.04.1, which governs procedures for forfeiture of property and money for violations of the Uniform Controlled Substances Act, as well as 21 U.S.C. §§ 853(a) and 881(d) and 19 U.S.C. § 1615, which govern similar forfeiture proceedings under federal law. The Lincoln Defendants first note that none of these statutes are applicable to them in this matter; as detailed below with respect to Plaintiff's constitutional claims, the Lincoln Defendants did not seize any property at the scene and therefore were in no position to employ any of the forfeiture procedures the statutes prescribe. Additionally, the federal statutes Plaintiff invokes provide for forfeiture of property "to the *United States*." 21 U.S.C. § 853(a) (emphasis added); see also 21 U.S.C. § 881(a). As noted below with respect to Plaintiff's Fifth Amendment claim, Plaintiff has neither shown nor even alleged that any of the Defendants in this matter are federal actors. The federal statutes cited in "Legal Claim #1," therefore, are inapplicable to the Lincoln Defendants.

Furthermore, Plaintiff cannot bring a civil cause of action under R.I. Gen. Laws § 21-28-5.04.1. The Rhode Island Supreme Court "ha[s] long held . . . that the creation of new causes of action is a legislative function." Bandoni v. State, 715 A.2d 580, 584 (R.I. 1998) (internal citations omitted). "When a statute does not plainly provide for a private cause of action [for damages], such a right cannot be inferred." Tarzia v. State, 44 A.3d 1245, 1258 (R.I. 2012) (alteration in original) (internal quotation marks omitted) (quoting Stebbins v. Wells, 818 A.2d 711, 716 (R.I. 2003)). R.I. Gen. Laws § 21-28-5.04.1 simply provides procedures for criminal forfeiture; it does not provide for a private cause of action by its terms. Thus, this statute is not a mechanism through which Plaintiff can bring a claim for damages against the Lincoln Defendants. Since Plaintiff is

8

unable to sustain a cause of action under any of the statutes enumerated in "Legal Claim #1," summary judgment should enter with respect to that claim.

>   D.   *Plaintiff's claim for negligent financial interference is not cognizable because he has not shown that any business relationship or expectancy existed, that the Lincoln Defendants knew of any such relationship or expectancy or acted to interfere with it, or that any purported interference caused him damages.*

Plaintiff describes "Legal Claim #2" of his Second Amended Complaint as a "Tort of Negligence Action-Claim Of Financial Interference." Second Amended Complaint, Docket at #46, at ¶ 74. He elaborates by alleging that the Lincoln Defendants "interfered with [his] right to gamble, and/or have money, and/or spend his money as he saw fit . . . ." Id. at ¶ 75. This claim appears to most closely resemble one for tortious interference with prospective economic advantage; to recover for such a claim, a plaintiff must show "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an intentional [and improper] act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." Beauregard v. Gouin, 66 A.3d 489, 496 (R.I. 2013) (alteration in original) (quoting Avila v. Newport Grand Jai Alai LLC, 935 A.2d 91, 98 (R.I. 2007)).

Plaintiff's "Legal Claim #2" fails at every step of this inquiry. First, Plaintiff has not shown the existence of a business relationship or expectancy. Evidence of a "reasonably anticipated contractual relationship would suffice, provided there is also shown a *then present* knowledge of that expected relationship on the part of the plaintiff." Bogosian v. Greenfield, C.A. No. P.C. 87-1186, 1992 R.I. Super. LEXIS 42, at *12 (Jan. 22, 1992) (emphasis added). In his Second Amended Complaint, Plaintiff refers only to his general ability "to gamble, and/or have money, and/or spend his money as he saw fit"; he has provided no evidence of any specific business or contractual relationship of which he was aware on April 29, 2016, and he has likewise presented

9

no evidence that the Lincoln Defendants knew of any such relationship. Second Amended Complaint, Docket at #46, at ¶ 75. Most importantly, "*there must be proof that the interference caused the damages,*" and without evidence of any seizure by the Lincoln Defendants, Plaintiff can present no such proof. Bogosian, 1992 R.I. Super. LEXIS 42, at *12 (emphasis in original). As such, summary judgment should enter in the Lincoln Defendants' favor with respect to "Legal Claim #2."

    E.    *Plaintiff cannot prove any violation of his constitutional rights.*

    1.    **Plaintiff's Fifth Amendment claim fails because he does not allege that any of the Defendants are federal actors.**

Plaintiff alleges several federal constitutional claims in "Legal Claim #3," including a due process claim pursuant to the Fifth Amendment. See Second Amended Complaint, Docket at #46, at ¶ 32(I). To state a claim for deprivation of property under the Fifth Amendment, Plaintiff must allege some action taken by the federal government. Schweiker v. Wilson, 450 U.S. 221, 227 (1981) (Fifth Amendment only applies to actions taken by the federal government, not state or local governments); Martinez-Rivera v. Ramos, 498 F.3d 3, 8-9 (1st Cir. 2007) (due process clause of Fifth Amendment only applies to actions of federal government). Because Plaintiff neither shows nor even alleges that any of the Defendants in this matter are federal actors, any Fifth Amendment claim fails.[2]

    2.    **None of Plaintiff's constitutional claims are viable because none of the Lincoln Defendants were involved in any seizure of Plaintiff's money and SUV.**

In addition to his claim under the Fifth Amendment, Plaintiff brings claims under the First, Fourth, Eighth, and Fourteenth Amendments. See Second Amended Complaint, Docket at #46, at

---

[2] Plaintiff also brings a due process claim under the Fourteenth Amendment. See Second Amended Complaint, Docket at #46, at ¶¶ 32(K)-(L). The Lincoln Defendants address that claim, along with Plaintiff's other constitutional claims, in section (E)(2), infra.

¶¶ 32, 77(C)-(D).  All of these claims arise from the purported seizure of the Mercedes and the $67,000 purportedly contained therein.  See id. at ¶¶ 14, 17-20, 22-23, 30.  They all fail, however, because none of the Lincoln Defendants conducted any seizure at all in this matter.

At the outset, the Lincoln Defendants note that several of the officers named in the Second Amended Complaint were in no way involved in the Police Department's response to the Marriott on April 29, 2016.  Packer and Ptaszek were not involved with any portion of the proceedings.  Exhibit J at 4, 6; Exhibit K at 5, 7.  Bolduc and Nightingale did not respond to the scene at any time; the extent of Bolduc's involvement was to review and approve the narratives of Kinniburgh, Sexton, Anterni, and Rodrigues about one month after the incident, and Nightingale's only involvement was possibly with court paperwork, also after the incident.  Exhibit L at 5, 7; Exhibit M at 4, 6-7.

Furthermore, the record does not indicate that any of the Lincoln officers who did respond to the scene seized any vehicle at any time.  After initially responding to the third floor of the Marriott, Kinniburgh remained there until he was asked to transport Harper back to the station shortly before 8:00 AM.  Exhibit A at 7.  Anterni likewise responded to the third floor and remained there, aside from a search of the stairwell with Rodrigues and Legare in the process of securing the scene, until he was relieved at 2:00 PM.  Exhibit C at 6-7.  Rodrigues did not report seizing any evidence of any kind during his time on scene, which was mainly spent interviewing the occupants of the neighboring room and conferring with Marriott staff about the assailants' entry into the building.  See Exhibit F at 6-7.  After assisting Anterni and Rodrigues in securing the scene, Legare remained on the third floor until he was relieved of his post.  Exhibit E at 6.

Gorman's involvement was likewise confined to the third floor of the Marriott; he began to process and photograph the scene but ceased after Sullivan informed him that the State Police

11

would be taking over the scene. Exhibit G at 5. The only evidence he handled was the white substance he observed in a baggie in room 318, which had already been seized by the State Police before he field tested it. Id. Neither Sullivan nor Gould handled any evidence in this matter; Sullivan spoke with Gorman and contacted the State Police, remaining in the third-floor hallway during his time on scene, while Gould spent most of his time on scene in the lobby of the Marriott before moving outside the hotel's entrance to provide a statement to the press. See Exhibit H at 5; Exhibit I at 3.

Of the responding officers, only Sexton was made aware of a white Mercedes during his response. See Exhibit D at 6. Even then, the subject arose only during Sexton's first encounter with Harper, who told Sexton that he was going to his car and identified the car as a white Mercedes. Id. Although Sexton then watched Harper walk toward a row of cars parked nearby, Harper turned around and started pacing before ever reaching any particular vehicle; thus, Sexton at no point even saw the Mercedes, let alone seized it. Id.

"When, as here, the movant-defendant has suggested that competent evidence to prove the case is lacking, the burden devolves upon the nonmovant-plaintiff to 'document some factual disagreement sufficient to deflect *brevis* disposition.'" Wynne, 976 F.2d at 794 (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)). "A non-moving party may not successfully defend against summary judgment where the evidence relied upon 'is merely colorable or is not significantly probative.'" Burke v. Town of Walpole, 405 F.3d 66, 76 (1st Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)); see also Gen. Office Prods. Corp. v. A.M. Capen's Sons, 780 F.2d 1077, 1078 (1st Cir. 1986) (quoting Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975)) ("The opposing party cannot defeat summary judgment by mere allegations but must bring 'sufficient evidence supporting the claimed factual dispute . . . to require

a jury or judge to resolve the parties' differing versions of the truth at trial.'"). In the instant matter, Plaintiff is unable to point to any evidence in the record to suggest that any of the Lincoln officers who responded to the scene seized anything in the course of their response, leaving only the assertions in his Second Amended Complaint that attribute the purported seizures to both the Lincoln Police Department and the State Police. Plaintiff's "proof," therefore, consists solely of "conclusory allegations, improbable inferences, and unsupported speculation," which must be ignored at this stage. Burke, 405 F.3d at 76 (quoting Roche v. John Hancock Mutual Life Ins. Co., 81 F.3d 249, 251 (1st Cir. 1996)). "The burden is on both parties to file necessary materials with the court to support their claims for and against summary judgment." Gen. Office Prods. Corp., 780 F.2d at 1078 (internal citations omitted). Since Plaintiff cannot meet this burden, summary judgment should enter in favor of the Lincoln Defendants.

> F. *Plaintiff's claims for conversion must fail because there is no evidence to suggest that any of the Lincoln Defendants took possession of any of his property.*

In both "Legal Claim #4" and "Legal Claim #5," Plaintiff alleges claims of conversion with respect to the Mercedes and the $67,000 purportedly contained therein. Second Amended Complaint, Docket at #46, at ¶¶ 78-81. Under Rhode Island law, the "gravamen of an action for conversion lies in the . . . taking [of the] personalty [of another party] without consent and exercising dominion over it inconsistent with the [other party's] right to possession." Turdo v. Main, 132 A.3d 670, 678 (R.I. 2016) (quoting Fuscellaro v. Indus. Nat'l Co., 368 A.2d 1227, 1230 (R.I. 1977)). The focus of a court's examination in a conversion claim is "whether [a] defendant has appropriated to his own use the chattel of another without the latter's permission and without legal right." Terrien v. Joseph, 53 A.2d 923, 925 (R.I. 1947).

In the instant matter, Plaintiff's conversion claims fail at the earliest possible stage. Once again, the Lincoln Defendants submit that none of the responding officers on April 29, 2016 took

13

possession of any of Plaintiff's property in the course of their response.  They never, therefore, exercised dominion or control inconsistent with any right to possession that Plaintiff had, and they did not appropriate any of Plaintiff's property for their own use.  Since Plaintiff cannot establish any seizure by the Lincoln Defendants, his conversion claim fails, and summary judgment should enter.

> G. *Plaintiff does not have a viable Monell claim against the Town because he has shown neither wrongdoing by any Police Department employee nor the existence of a municipal policy or custom of unconstitutional seizure.*

Although he does not include them in any of his five "Legal Claims," Plaintiff makes several allegations throughout his Second Amended Complaint that the Town created a policy, either by writing or by custom, that "failed to train/supervise all LPD . . . Officers-Defts, in the proper course of action, in this case" and "led to the specific conspiracy of seizing/converting/stealing" Plaintiff's property.  Second Amended Complaint, Docket at #46, at ¶¶ 37(B), 44(B); see also ¶¶ 46-47, 61.  A municipality may be held liable under § 1983 "when its agents and employees committed constitutional violations, but not under a theory of respondeat superior."  Young v. City of Providence, 404 F.3d 4, 24 (1st Cir. 2005); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-95 (1978).  "[O]nly when the governmental employees' execution of a government's policy or custom . . . inflicts the injury and is the moving force behind the constitutional violation . . . can [the municipality] be liable."  Young, 404 F.3d at 24 (internal quotations omitted); see Monell, 436 U.S. at 694.  "Assessing liability against the [Town] requires two basic elements: first, that [P]laintiff's harm was caused by a constitutional violation, and second, that the [Town] be responsible for that violation."  Young, 404 F.3d at 25-26; see also Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992).

The United States Supreme Court, "concerned that municipal liability based on fault by the City might collapse into de facto respondeat superior, has set a *very high bar* for assessing municipal liability under Monell." Young, 404 F.3d at 26 (emphasis added); see, e.g., Silva v. Worden, 130 F.3d 26, 31-32 (1st Cir. 1997) (noting that the alleged municipal action at issue must constitute a policy of custom attributable to the municipality). The U.S. Supreme Court has imposed two additional requirements to prove municipal liability: first, "that the municipal policy or custom actually have caused the plaintiff's injury, and [second] that the municipality possessed the requisite level of fault, which is generally labeled in these sorts of cases as 'deliberate indifference.'" Young, 404 F.3d at 26. "Causation and deliberate indifference are separate requirements, although they are often intertwined." Id.

In the first instance, the Town "cannot be derivatively liable for what was not a violation in the first place." Carapellucci v. Winchester, 707 F. Supp. 611, 618 (D. Mass. 1989) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)). As discussed above, no Police Department employee violated Plaintiff's constitutional rights during the response to the Marriott on April 29, 2016. Several of the named officers did not even respond to the call that day. Exhibit I at 4, 6; Exhibit J at 5, 7; Exhibit K at 5, 7; Exhibit L at 4, 6-7. Those who did respond did not report seizing any evidence, and the scene was eventually turned over to the State Police. See Exhibit A at 6-7; Exhibit B; Exhibit C at 6-7; Exhibit D at 6; Exhibit F at 6-7; Exhibit G at 4-5. Without the required individual liability, the Town cannot be held responsible and judgment must enter in its favor.

      H.    *The Lincoln Defendants are entitled to qualified immunity.*

      1.    **The individual Lincoln Defendants are entitled to qualified immunity with respect to Plaintiff's federal claims because Plaintiff can provide no clearly established right under federal law that was violated in this matter.**

The individual Lincoln Defendants submit that they are protected by the doctrine of qualified immunity with respect to Plaintiff's federal constitutional claims, contained within "Legal Claim #3" of his Second Amended Complaint. As Defendants have "raise[d] a qualified immunity defense, [Plaintiff] has the burden of showing that qualified immunity does not apply." Sargent v. Town of Hudson, Civil No. 14-cv-509-AJ, 2013 U.S. Dist. LEXIS 200432, at *3 (D.N.H. Sept. 27, 2017); see Mitchell v. Miller, 790 F.3d 73, 77 (1st Cir. 2015) (second prong); cf. Lopera v. Town of Coventry, 640 F.3d 388, 395-96 (1st Cir. 2011) (first prong); Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011). "The doctrine of qualified immunity protects governmental officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is not a defense on the merits but is instead "an entitlement not to stand trial or face the other burdens of litigation." Saucier v. Katz, 533 U.S. 194, 200 (2001) (citation omitted). Qualified immunity protects individual defendants from liability even if it is determined that a constitutional right has been infringed upon. Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir 1998) (citing Harlow, 457 U.S. 800, 814-15 (1982)).

At its heart, the doctrine of qualified immunity is designed to strike the classic balance between freedom and security. See Pearson, 555 U.S. at 231 (noting that qualified immunity balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably"). The United States Supreme Court has recognized that when an official is impeded by the threat of financial liability from doing that which a reasonable official would believe is legal and necessary, the harm done to society in the case of close constitutional questions

outweighs the harm done to the individual whose rights are marginally violated.  Harlow, 457 U.S. at 814.  The purpose behind granting officials such immunity, therefore, is to allow them to perform their duties and act in areas where clearly established rights are not implicated "with independence and without fear of consequence."  Id. at 819.  Officials therefore enjoy "an immunity from suit rather than a mere defense to liability [which] . . . is effectively lost if a case is erroneously permitted to go to trial."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

The starting point for any claim for qualified immunity is the well-settled, two-part standard.[3]  "To determine whether a particular [official] is entitled to qualified immunity, '[a] court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  Maldonado, 568 F.3d at 269 (internal citation omitted).  "'Under ordinary circumstances, the development of the doctrine of qualified immunity is best served by approaching these inquiries' in sequence."  Burke, 405 F.3d at 77 (quoting Cox v. Hainey, 391 F.3d 25, 30 (1st Cir. 2004)).

The analysis begins, therefore, with the "threshold question" of "whether 'all the uncontested facts and any contested facts looked at in . . . [P]laintiff's favor' allege a constitutional violation."  Burke, 405 F.3d at 77 (quoting Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 62 (1st Cir. 2004)).  "[C]ourts assessing the first prong at summary judgment should look beyond the complaint to the broader summary judgment record."  Riverdale Mills Corp., 392 F.3d at 62 (internal citations omitted).  This inquiry "will usually gain specificity at this summary judgment stage," since a court can "determine then whether [a] plaintiff's claim survives" in light of a more robust record, "rather than just the allegations that appear on the face of the complaint."  Id.

---

[3] The standard at times has also been identified as a three-pronged analysis because the "clearly established" standard requires a two (2) step analysis.  Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).

17

Plaintiff's contentions fail to survive past this threshold stage of the qualified immunity analysis because none of the Lincoln Defendants conducted any seizure at all. As noted above with respect to Plaintiff's constitutional claims, none of the Lincoln Defendants ever seized or otherwise took possession of a Mercedes or any money purportedly contained therein, making any constitutional violation arising from such conduct impossible. Without any such evidence in the record, Plaintiff has failed to allege or show, beyond conclusory allegations in his Second Amended Complaint attributing both purported seizures to both the Lincoln Police Department and the State Police, that any member of the Lincoln Police Department violated his constitutional rights. As a result, the individual Lincoln Defendants are entitled to qualified immunity, and judgment should enter in their favor.

2. **All of the Lincoln Defendants are entitled to qualified immunity with respect to Plaintiff's state law claims because those claims are grounded in his federal constitutional claims.**

Plaintiff's state law claims for negligent financial interference, conversion, and violation of R.I. Gen. Laws § 21-28-5.04.1 are grounded in his federal constitutional claims. As a result, the individual Lincoln Defendants are also entitled to qualified immunity with respect to the state law claims, much like the qualified immunity afforded under § 1983. Estrada v. Rhode Island, 594 F.3d 56, 63 (1st Cir. 2010) (citing Hatch v. Town of Middletown, 311 F.3d 83, 89-90 (1st Cir. 2002) (officer entitled to qualified immunity under federal law also entitled to qualified immunity for same claim under Rhode Island law)); see also Ensey v. Culhane, 727 A.2d 687, 690 (R.I. 1999); Pontbriand v. Sundlun, 699 A.2d 856, 867 (R.I. 1997). "Ensey and Pontbriand reflect Rhode Island's recognition of a qualified immunity defense under state law analogous to the federal doctrine established by the United States Supreme Court in Harlow, 457 U.S. at 818, cited

18

with approval in both Rhode Island decisions, and routinely applied in § 1983 cases." Hatch, 311 F.3d at 90.

Furthermore, because the individual officers are immune from suit on the state law claims, so too are the Town and the Police Department. See Morales v. Town of Johnston, 895 A.2d 721, 728-29 (R.I. 2006) (where high school soccer coaches have statutory immunity from suit, school district cannot be held liable based upon same conduct); see also Gray v. Derderian, 400 F. Supp. 2d 415, 424 (D.R.I. 2005) (no "liability can be charged to the [municipality], based on the doctrine of respondeat superior, if the [municipality's] agent or employee is immune from prosecution"); DiQuinzio v. Panciera Lease Co., 612 A.2d 40, 43 (R.I. 1992) (because operator of vehicle immune from suit pursuant to exclusivity provision of Workers' Compensation Act, there could be no cause of action against vehicle owner).

### IV.   CONCLUSION

For the reasons set forth herein, the Lincoln Defendants respectfully ask that this Court grant their motion for summary judgment.

                Defendants,
                By their attorneys,

                */s/Marc DeSisto*

                */s/Patrick K. Burns*
                Marc DeSisto, Esq. (#2757)
                Patrick K. Burns, Esq. (#10107)
                DESISTO LAW LLC
                60 Ship Street
                Providence, RI 02903
                (401) 272-4442
                marc@desistolaw.com
                pburns@desistolaw.com

CERTIFICATION OF SERVICE

I hereby certify that on this 27th day of August, 2020, I electronically filed and served this document through the electronic filing system upon the following:

Chrisanne Wyrzykowski (#7565)  Justin J. Sullivan (#9770)
cwyrzykowski@riag.ri.gov        jjsullivan@riag.ri.gov

I further certify that a true and accurate copy of the within was mailed, postage pre-paid, this 27th day of August, 2020, to:

Richard Ferreira, *Pro Se*
PO Box 8000
Shirley, MA 01464

/s/Patrick K. Burns