## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

**RICHARD FERREIRA,**
  *Plaintiff*

**v.**                                                    **C.A. No. 19-cv-00200-JJM-PAS**

**TOWN OF LINCOLN; ET AL.,**
  *Defendants*

## MEMORANDUM OF LAW IN SUPPORT OF STATE DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

  **NOW COME** Defendants, the Rhode Island State Police ("RISP"); Colonel James Manni, in his individual capacity and official capacity as Superintendent of the Rhode Island State Police ("Defendant Col. Manni"); Lieutenant John Grassel, ("Defendant Lt. Grassel"); Sergeant Kenneth DeMarco, ("Defendant Sgt. DeMarco"); Sergeant Scot Baruti[1] ("Defendant Sgt. Baruti"); and, Trooper Katheryn Hirsch ("Defendant Trooper Hirsch") in their individual and official capacities (collectively, the "State" or "State Defendants") hereby file this Memorandum of Law in support of State Defendants' Motion for Summary Judgement. As grounds thereof, State Defendants assert that there exists no genuine issue of material fact and State Defendants' are entitled to judgment as a matter of law.

## FACTUAL BACKGROUND

  The material facts are not in dispute. In the early morning hours of April 29, 2016, RISP received a request from the Lincoln Police Department ("LPD") to assist with an ongoing attempted murder investigation involving a shooting at the Courtyard Marriot Hotel in Lincoln,

---

[1] At the time he conducted the investigation, Sgt. Baruti held the rank of corporal. Subsequently, he was promoted. Out of respect, Sgt. Baruti will be referred to at his current rank.

Rhode Island (the "Marriot"). See State Defendants' Statement of Undisputed Facts [hereinafter, SUF] at ¶ 1. While assisting LPD with the investigation, RISP Detectives learned the following information:

1. **The Hampton Inn (Westport, Massachusetts):**

In the twenty-four (24) hours prior to the shooting, Ferreira ("Plaintiff" or "Ferreira") and Isabela Silva ("Silva") had stayed at different hotel, the Hampton Inn in Westport, Massachusetts and planned to travel to South Carolina in a 2005 Mercedes Benz ML350 (the "Mercedes SUV"), registered to Charles Flint.[2] See SUF at ¶¶ 1-3, 7-8. While checking into the Hampton Inn at approximately 9:45 AM on April 28, 2016, Ferreira convinced a prostitute, Clifton Jefferson ("Jefferson"), to register the hotel room under Jefferson's name, so Ferreira could avoid drawing unwanted attention; namely, because Ferreira was a fugitive. Id. at ¶¶ 4-5. In addition to outstanding warrants in Massachusetts and Rhode Island, Ferreira was known to law enforcement as a habitual offender for violent crimes and narcotics trafficking[3] and was also carrying a large amount of cash on his person. Id. at ¶¶ 4-7.

That afternoon, Jefferson invited Gerron Harper ("Harper") to the Hampton Inn hotel room. Shortly after Harper arrived, Ferreira invited Harper to stay the night and travel to South Carolina with him and Silva. Id. at ¶¶ 10-14. After arriving at the Hampton Inn hotel room, Harper became aware that Ferreira was carrying a large amount of cash. Id. at ¶ 20. Later that evening, between 7:00 PM and 9:00 PM, Silva learned that Ferreira had invited Harper to travel with them to South Carolina and that Harper knew about the money, and Silva became upset and started arguing with

---

[2] It is unclear why Ferreira and Silva were using Flint's Mercedes SUV.

[3] Ferreira's criminal history includes but is not limited to: assault with a deadly weapon, armed assault, breaking and entering, distribution of narcotics, possession with intent to distribute fentanyl, and assault and battery. See SUF at ¶ 154.

Ferreira in the Hampton Inn hotel room. Id. at ¶¶ 18-22. Following the argument, Silva went to the Hampton Inn parking lot to smoke a cigarette and calm down. Id. at ¶ 22.

While Silva was in the Hampton Inn parking lot, two black males wearing black sweatshirts and fake police badges approached her aggressively and pinned Silva against a nearby vehicle. Id. at ¶¶ 23-25. The two men two men waived handguns at Silva and demanded to know where Ferreira was and where he was keeping "the money". Id. at ¶¶ 23-25. Silva was able to free herself and ran from the two men and escaped inside the Hampton Inn. Id. at ¶¶ 25. The two men followed Silva to the pool area and began to walk towards her but turned around and left the pool area when Silva screamed for help. Id. at ¶¶ 25-26. Silva returned to the Hampton Inn hotel room and told Ferreira about the incident with the two men. Id. at ¶¶ 27. Harper tried, unsuccessfully, to convince Ferreira that Silva was lying, Ferreira determined that the Hampton Inn was no longer safe and they should leave. Id. at ¶¶ 28-29. Ferreira, Silva, and Harper left the Hampton Inn the night of April 28, 2016, traveling in the previously identified Mercedes SUV. Id. at ¶¶ 29-31.

**The Courtyard Marriot Hotel (Lincoln, Rhode Island):**

After leaving the Hampton Inn, Silva drove Ferreira and Harper in the Mercedes SUV to the Marriot. Id. at ¶¶ 31-32. Ferreira, Silva, and Harper arrived at approximately 3:45 AM on April 29, 2016, locked the Mercedes SUV, and checked into Marriot room #318. Id. at ¶¶ 29-34. Once in the Marriot room, Ferreira fell asleep on the second bed, Silva fell asleep in a lounge chair in the corner of the room, and Harper laid down on the bed closest to the door. Id. at ¶¶ 38-40. Silva kept the key to the Mercedes SUV in the Marriot hotel room. Id. at ¶ 35. Ferreira and Silva fell asleep quickly in the hotel room, while Harper stayed awake on his cell phone texting. Id. at ¶¶ 38-40.

Shortly after falling asleep, between 3:45 AM and 4:30 AM, Ferreira awoke to someone

knocking at the door to the hotel room and got out of bed to answer the door. Id. at ¶¶ 41-42. Ferreira opened the hotel room door and two men entered several feet into the hotel room and began arguing with Ferreira. Id. at ¶¶ 42-43. Silva and Harper awoke to Ferreira screaming at the two men standing inside the room, whom Silva recognized as the same two gunmen[4] from the Hampton Inn. Id. at ¶¶ 43-45. Ferreira then punched one of the men and knocked him to the ground. Id. at ¶¶ 48. During the fight, one of the men drew a gun and shot Ferreira twice, striking him in the teeth and the left side of his torso, and causing Ferreira to collapse to the floor. Id. at ¶¶ 48-50. Following the gunshots, the two men fled the hotel room without saying anything. Id. at ¶ 53.

Once the gunmen left, Ferreira yelled "I'm dying man!" and Silva and Harper observed a significant amount of blood around Ferreira's head, face, and stomach area. Id. at ¶¶ 53-54. Harper began to panic and ran around the room yelling. Id. at ¶ 51. Silva realized Ferreira had been shot and used the hotel room phone to call the front desk at the Marriot and asked for assistance for Ferreira. Id. at ¶ 54-56. Meanwhile, Harper attempted to move Ferreira out of the Marriot hotel room and into the hallway. Id. at ¶ 55. Harper then fled the Marriot room with a cell phone and walked outside into the Marriot parking lot, where the locked Mercedes SUV was parked, and then to a Sunoco gas station directly next to the Marriot. Id. at ¶¶ 57-59. While inside the Sunoco, Harper attempted to secure transportation with the intent to flee the area. Id. at ¶ 59. Marriot security contacted LPD, who dispatched officers to the Marriot. Id. at ¶¶ 60-61.

**Lincoln Police Respond to the Marriot Hotel:**

Arriving at the Marriott Hotel, LPD officers observed Harper at the gas station next to the hotel and placed Harper in custody, believing he was a suspect connected to the shooting. Id. at ¶¶

---

[4] It is unknown how the two men knew that Ferreira was staying at the Marriot in room #318. See SUF at ¶ 46.

60-63. Silva arrived at the gas station shortly afterwards and told the LPD officers that Harper did not shoot Ferreira and the shooters may still be inside the Marriot. Id. at ¶¶ 64-68. The LPD officers released Harper, who requested to enter the Mercedes SUV. Id. at ¶ 69. The LPD officers instructed Harper and Silva to follow them back to the Marriot and wait in the lobby. Id. at ¶ 70. The LPD officers went to the Marriot to check on Ferreira's condition and discovered him bleeding in the hallway outside Marriot room #318. Id. at ¶¶ 71-76. While in the lobby of the Marriot hotel, Harper told Silva not to talk to the police unless Ferreira tells her otherwise. Id. at ¶ 77. Another LPD officer arrived at the Marriot and observed Harper start to exit the lobby and walk towards the Marriot parking lot, after the other LPD officers instructed him to stay in the lobby. Id. at ¶¶ 78-81. Harper lied to the officer and said that the prior LPD officer had instructed Harper to go outside to calm down, so he was going to his car, and described the Mercedes SUV. Id. Harper then walked out of the lobby and towards the row of cars parked outside, while the Officer proceeded upstairs to assist the other LPD officers secure the scene. Id. at ¶¶ 78-83. Harper was soon after spotted returning to the lobby from the parking lot where the Mercedes SUV was parked. Id. at ¶¶ 84-85. Harper gave his personal information to LPD Officer Sexton but lied about not having a cell phone or contact number. Id. at ¶ 86. Harper then proceeded back upstairs to the third floor and told LPD officers that he wanted to retrieve his cell phone from Marriot room #318, despite having just told another LPD officer that he did not have a cell phone. Id. at ¶¶ 86-88. Harper then grew agitated towards the LPD officers and was escorted back to the lobby. Id.

Once the Marriot room #318 was secure, LPD officers began interviewing witnesses from the neighboring rooms. Id. at ¶ 89. Ferreira was subsequently transported by ambulance to Rhode Island Hospital, where he was treated for gunshot wounds. Id. at ¶ 90. LPD Detective Gorman ("Det. Gorman") arrived at the Marriott Hotel at approximately 5:40 AM and began photographing

and processing the crime scene. Id. at ¶ 91. At or about that time, LPD Chief of Police Brian Sullivan contacted RISP and requested assistance with processing the crime scene, securing evidence, and interviewing witnesses. Id. at ¶ 92.

**Rhode Island State Police respond to the Marriot:**

Several members of RISP were dispatched to assist LPD with the investigation, including Defendant Sgt. Baruti, Defendant Lt. Grassel, and Defendant Sgt. DeMarco. Id. at ¶¶ 93. Sgt. Baruti was assigned to assist LPD with gathering evidence and surveillance footage and Defendants Lt. Grassel and Sgt. DeMarco were assigned to process and photograph the crime scene and canvass the surrounding area. Id. at ¶¶ 93-95. While photographing and processing the Marriot hotel room, RISP Detectives recovered a package containing suspected narcotics, which was later determined to contain heroin. Id. at ¶ 99. RISP Detectives also recovered assorted cash totaling $3.00, which was counted and logged as Property #16RIX1-1310-PR, by Defendant Sgt. DeMarco and RISP Detective Melissa Giardina and verified by Defendant Lt. Grassel. Id. at ¶ 100. RISP detectives also recovered a purse from the Marriot hotel room, which contained assorted cash totaling $699.27, which was counted and logged as Property #16RIX1-1310-PR, by Defendant Sgt. DeMarco and RISP Detective Melissa Giardina and verified by Defendant Lt. Grassel. Id. at ¶ 101. RISP did not recover the key to the Mercedes SUV that Silva kept in the Marriot hotel room. Id. at ¶ 102.

Defendant Sgt. Baruti recovered surveillance footage from the Sunoco gas station next to the Marriot hotel. Id. at ¶ 103. The video depicted Harper using a cell phone at the gas station. Id. at ¶¶ 103. Defendant Sgt. Baruti learned that Harper subsequently discarded the cell phone and then lied to the LPD officers when asked about having a cell phone. Id. at ¶¶ 86-88, 103. At that time, LPD took Harper and Silva into custody and transported them to LPD Headquarters for

formal police interviews. Id. at ¶¶ 104-107. Members of RISP participated in the police interviews of Harper and Silva. Id.

Harper refused to answer any questions, including the whereabouts of the cell phone he had discarded after the shooting. Id. at ¶ 112. RISP Detectives also believed the discarded cell phone may contain evidence related to the investigation. Id. at ¶ 113.

Silva agreed to be interviewed and provided a statement. When questioned by LPD Detectives where Ferreira kept the money while they were staying in the Marriot hotel room, Silva stated that Ferreira "had the money on him." Id. at ¶¶ 106-109. Silva also confirmed that Ferreira would not keep the money in the Mercedes SUV. Id. at ¶ 110. Silva estimated that it was approximately $17,000.00. Id. at ¶ 111.

**Search of the Mercedes SUV**

Defendant Sgt. Baruti also learned that Mercedes SUV not was not registered to Ferreira, Silva, or Harper; it was registered to Charles Flint ("Flint"). Id. at ¶ 115. A criminal records check was performed on Ferreira, Harper, Silva, and Flint, which revealed that all four individuals had been previously arrested for violent crimes and charged with drug distribution. Id. at ¶ 116. The Mercedes SUV was impounded and towed by Knox's Garage and Towing, from the Marriot to RISP headquarters to secure it and preserve any evidence while Sgt. Baruti applied for a search warrant. Id. at ¶¶ 117-118. Chief Judge Jeanne E. LaFazia issued a search warrant on April 29, 2016, to search the Mercedes SUV, including the trunk, for "firearms, ammunition, clothing, cellular phones, multimedia devices, gunshot residue, biological evidence, USA currency and receipts [and] any and all evidence pertaining to the attempted murder of Richard Ferreira…." Id. at ¶¶ 119.

After the search warrant was obtained, Det. Brezniak of the RISP Forensic Services Unit

performed a detailed search of the Mercedes SUV between April 29, 2016 and May 10, 2016. Id. at ¶ 120. A search of the glove box produced assorted cash located within three layers of plastic bags inside of the glove box; the outermost layer was a black plastic bag; the second layer was a clear sealed Ziploc bag; the third, innermost layer consisted of a knotted white plastic Target bag. Id. at ¶ 121. The cash recovered from the glove box was counted, totaling $23,040.00, and was logged as Property #16RIX1-1292-PR, by Detective Kyle Shibley ("Det. Shibley") and Sgt. Baruti on April 29, 2016. Id. at ¶ 121-122. A search of the SUV also produced a Massachusetts driver's license for Charles Flint. Id. at ¶ 123.

Det. Shibley went to local Bank of America on May 2, 2016 to deposit the $23,040.00 seized from the Mercedes SUV. Id. at ¶¶ 124-125. After handing the seized cash to a Bank of America employee, Det. Shibley was advised that the cash counting machine indicated a total amount of $22,970.00. Id. Upon further inspection, it was revealed that the sum contained a counterfeit $20 bill,[5] and that the dollar count was off by $50. Id. at ¶¶ 125-127. After speaking with the bank manager and alerting Defendant Sgt. Baruti about the $50 discrepancy, Det. Shibley made a total deposit of $22,970.00 on May 2, 2016. Id. at ¶¶ 124-127.

A subsequent search of the general interior of the Mercedes SUV produced assorted cash totaling $25.00, which was counted and logged as Property #16RIX1-1300-PR by Det. Brezniak and Det. Shawn Slade and verified by Lt. Grassel on May 2, 2016. Id. at ¶¶ 128-129. A search of a purse located in the trunk of the Mercedes SUV produced assorted cash totaling $2,210.00, which was counted and logged as Property #16RIX1-1307-PR by Det. Brezniak and Det. Shawn Slade and verified by Lt. Grassel on May 2, 2016. Id.

---

[5] The counterfeit $20 bill was seized and returned to RISP headquarters and logged as Property #16RIX1-1306-PR. See SUF at ¶ 127.

On May 3, Det. Shibley returned to Bank of America and made four (4) additional deposits of seized cash totaling $2,937.27, which consisted of $25.00 recovered from the SUV interior (Property #16RIX1-1300-PR); $2,210.00 recovered from a purse in the trunk of the SUV (Property #16RIX1-1307-PR); $699.27 recovered from a purse found in the Marriot hotel room (Property #16RIX1-1310-PR); and, $3.00 recovered from the Marriot hotel room (Property #16RIX1-1316-PR). Id. at ¶ 130. The total amount of cash seized by RISP in connection with the investigation of the shooting is $25,907.27.[6] Id. at ¶ 131. To date, forfeiture proceedings have not commenced against the $25,727.27 seized by RISP. Id. at ¶ 144.

**Subsequent Arrests and Seizures:**

LPD subsequently charged Ferreira and Harper with felony possession for the heroin recovered from the Marriot hotel room after the shooting. Id. at ¶¶ at 132-133; see also State of Rhode Island v. Harper, C.A. No. 32-2016-04332 (R.I. 6th Div. Dist. Ct. May 2, 2016); State of Rhode Island v. Ferreira, C.A. No. 32-2016-04547 (R.I. 6th Div. Dist. Ct. May 2, 2016). RISP released the Mercedes SUV to Flint on August 5, 2016. Id. at ¶ 134. On August 22, 2016, RISP was notified that LPD was suspending the investigation of the shooting because Ferreira was refusing to cooperate. Id. at ¶ 135.

A few months later, in November 2016, Ferreira was arrested in Massachusetts for drug-trafficking offenses that were not connected to the shooting at the Marriot, but that did involve another large cash seizure by police. See SUF at ¶ 136. On November 5, 2016, while arresting Ferreira for outstanding warrants, Fall River Police observed drug paraphernalia and secured a search warrant for Ferreira's apartment. Id. at ¶¶ 137-139. A search of the apartment produced a

---

[6] For the sake of clarity, the $25,907.27 consists of $702.27 seized from the Marriot hotel room and $25,205.00 seized from the Mercedes SUV. See SUF at ¶¶ 100-101, 121, 128-129.

produced a digital scale, numerous prescription pills, a "drug ledger", and assorted cash totaling $35,084.00. Id. Fall River Police seized the $35,084.00 and applied to the Bristol County District Attorney to commence a forfeiture proceeding. Id. at ¶ 140. The $35,084.00 was forfeited to the Commonwealth of Massachusetts[7] and Ferreira was indicted in December 2016 on multiple felony drug charges, including possession of a controlled substance with the intent to distribute. Id. at ¶ 140-143. 145; see also Commonwealth of Massachusetts v. Ferreira, C.A. No. 1673CR00427 (Bristol Cty. Super. Ct. Dec. 8, 2016).

Nearly eleven months later, while the Massachusetts indictment was pending, Ferreira was arrested again in Rhode Island for multiple offenses, involving another large cash seizure by police. See SUF at ¶ 147. On October 29, 2017, Tiverton Police arrested Ferreira for several traffic-related offenses[8] and seized $27,156.00 from Ferreira, incident to the arrest. Id. at ¶ 147-148; see also State of Rhode Island v. Ferreira, C.A. Nos. 22-2017-02508; 21-2017-02506; 21-2017-02505; 21-2017-02502 (R.I. Dist. Ct. Oct. 30, 2017). Because of the pending Massachusetts indictment for narcotics distribution, Ferreira was charged as a fugitive, held without bail, and transported to the ACI.[9] See SUF at ¶¶ 148-149; see also State of Rhode Island v. Ferreira, C.A. No. 221702508 (R.I. Dist. Ct. Oct. 30, 2017). 136. Ferreira pled nolo contendere to several of the charges on

---

[7] The cash seized by RISP and Fall River Police in 2016 in connection with the 2016 shooting and both of Plaintiffs' 2016 drug-related arrests totals $60,811.27. See SUF at ¶ 145.

[8] Ferreira was charged with leaving the scene of an accident resulting in property damage, driving on a suspended license (third offense), reckless driving, and attempting to elude police. See SUF at ¶¶ 148-149.

[9] Criminal charges filed against Ferreira in 2019 allege that on October 29, 2017, prior to his arrival at the ACI, Ferreira hid a large amount of fentanyl in his rectum to traffic inside the ACI. See SUF at ¶¶ 153-156; State of Rhode Island v. Ferreira, C.A. P2-2019-5360A (R.I. Super. Ct. 2019). Once inside the ACI, it is alleged that Ferreira removed the fentanyl, repackaged it, and began selling quantities of the narcotic to other inmates in exchange for commissary items, which resulted in the near death of another inmate. See SUF at ¶¶ 153-156.

November 7, 2017 and was subsequently extradited to Massachusetts. See SUF at ¶ 150. Commonwealth of Massachusetts v. Ferreira, C.A. No. 1673CR00427 (Bristol Cty. Super. Ct. Dec. 8, 2016). After arriving in Massachusetts, Ferreira pled guilty to possession of a controlled substance with the intent to distribute narcotics and was sentenced to four (4) years in prison, with two (2) years to serve at the Bristol County House of Corrections. See Commonwealth of Massachusetts v. Ferreira, C.A. No. 1673CR00427 (Bristol Cty. Super. Ct. Dec. 8, 2016).

In October 2019, during the pendency of this litigation, the State of Rhode Island charged Ferreira with numerous narcotics-related crimes, including manufacturing and trafficking fentanyl into the ACI.[10] See SUF at ¶¶ 153-156; see also State of Rhode Island v. Ferreira, C.A. P2-2019-5360A (R.I. Super. Ct. 2019). Ferreira has been charged as a habitual offender, pursuant to R.I. Gen. Laws § 12-19-21. See SUF at ¶¶ 153-156.

**The Complaint:**

On April 22, 2019, Ferreira filed the instant civil lawsuit against LPD and RISP, while serving a criminal sentence in Massachusetts for a drug trafficking-related offense.[11] Id. at ¶ 157; see also Commonwealth of Massachusetts v. Ferreira, C.A. No. 1673CR00427 (Bristol Cty. Super. Ct. Dec. 8, 2016). On June 4, 2020, Ferreira filed a Second Amended Complaint (ECF 46) (the "Complaint"). See SUF at ¶ 160. The Complaint contains the following allegations:

---

[10] On July 14, 2020, Ferreira sent a letter to this Court, containing a self-titled document that accused Assistant Attorney General Chrisanne Wyrzykowski of engaging in a conspiracy with RISP to "cover up" the alleged theft of $67,000.00 by "deliberately engineering the filing of the criminal case in 2019…" to "coerce, threaten, and intimidate" Ferreira into dismissing the instant lawsuit. See SUF ¶ 167; see also State of Rhode Island v. Ferreira, C.A. P2-2019-5360A (R.I. Super. Ct. 2019).

[11] Ferreira was extradited from Massachusetts to Rhode Island and posted bail in October 2020. See SUF ¶ 159.

▪ that "$67,000.00 was taken by [State Defendants] on April 29, 2016" from inside the Mercedes SUV.[12] Id.

▪ Defendant Col. Manni "failed/refused to train, supervise, and/or create policy or suggest policy changes in relation the seizure of vehicles, which should have included … return of the $67,000.00…." Id.

▪ Defendants Lt. Grassel, Sgt. Baruti, and Trooper Hirsch were "involved on April 29, 2016, in the actual investigation, and seizure of the SUV, where [Ferreira], had $67,000.00 stored within, which [State Defendants] seized/converted/stole, along with other personal effects of [Ferreira]…." Id.

▪ Defendants Lt. Grassel, Sgt. Baruti, and Trooper Hirsch were "so poorly trained, funded, supervised in RISP policy/rules/regulations that these [Defendants] then located $25,996.00 (from the $67,000.00), and refused to return it to [Ferreira]." Id.

The Complaint asserts the following legal claims:

a. "Legal Claim #1" asserts that the "seizure/conversion/theft of the $67,000.00" … created a Tort of Negligence Action…" and also violated R.I. Gen. Laws § 21-28-5.04.1 and 21 U.S.C. §§ 853(a) and 881(d) and 19 U.S.C. § 1615. Id. at ¶ 161.

b. The Complaint alleges in "Legal Claim #2" that State Defendant's "acts and omissions … created a Tort of Negligence Action-Claim of Financial Interference…." Id.

c. The Complaint alleges in "Legal Claim #3" that State Defendant's "acts and omissions" violated Ferreira's First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights under

---

[12] Ferreira also annexes to the Complaint a letter dated May 1, 2019 from Attorney John Cicilline to Ferreira that states "In order to file a Motion for Return of Evidence, I will need the documentation you (Ferreira) have showing that [t]he State Police are in possession of your seized $67,000." See SUF at ¶ 163.

the United States Constitution.[13] <u>Id.</u>

    d.   The Complaint alleges in "Legal Claim #4" that State Defendant's "acts and omissions … created a Willful and Malicious Tort Of [*sic*] Conversion…." <u>Id.</u>

    e.   The Complaint alleges in "Legal Claim #5" that State Defendant's "acts and omissions … created a [*sic*] Innocent, Technical, Reckless Tort Of [*sic*] Conversion…."[14] <u>Id.</u>

The Complaint seeks return of unspecified "personal effects" and damages consisting of: $67,000.00, with interest, $25,996.00, and between $10,000.00 and $5 million. <u>Id.</u> at ¶ 165.

<u>**STANDARD OF REVIEW**</u>

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact is an issue that "may reasonably be resolved in favor of either party." <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 250 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." <u>Id.</u> Furthermore, a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. <u>Id.</u> But, in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587–88 (1986); <u>see also</u> <u>Garmon v. National Railroad Passenger Corp.</u>, 844 F.3d 307, 312 (1st Cir. 2016) ("Although [this Court] will draw all reasonable inferences in the nonmovant's favor, [this Court] will not 'draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic

---

[13] "Legal Claim #3" consists solely of federal constitutional claims brought under 42 U.S.C. § 1983. <u>See</u> SUF at ¶ 161.

[14] "Legal Claim #1", "Legal Claim #2", "Legal Claim #4", and "Legal Claim #5" are comprised of state law claims. <u>See</u> SUF at ¶ 161.

invective.'").

Thus, to avoid "the swing of the summary judgment scythe," the opposing party must "adduce specific facts showing that a trier of fact could reasonably find in his favor" and cannot rely on "conclusory allegations, improbable inferences, and unsupported speculation." Justiniano v. Walker, No. 18-2015, 2021 WL 164975, at *10 (1st Cir. Jan. 19, 2021) (internal quotations omitted); Garmon, 844 F.3d at 312 ("[A] party cannot successfully oppose a motion for summary judgment by resting 'upon mere allegations or denials of his pleading.'"). If, however, there exists a genuine dispute of material fact, that issue would "need[ ] to be resolved by the trier of fact." Doe v. Tr. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018).

## ARGUMENT

### I.   PLAINTIFF SETS FORTH NO EVIDENCE THAT STATE DEFENDANTS SEIZED $67,000.00 OR THAT PLAINTIFF IS ENTITLED TO THE $25,727.27 SEIZED IN CONNECTION WITH THE CRIMINAL INVESTIGATION

Ferreira's claim that State Defendants stole $67,000 fails, because Ferreira has produced no evidence demonstrating that State Defendants ever seized $67,000.00 during the investigation of the shooting. Furthermore, Ferreira has failed to show he has any right to possess the $25,205.00 that State Defendants seized pursuant to a valid search warrant. See SUF at ¶ 118 (authorizing search of the Mercedes SUV for "cellular phones … USA currency … any and all evidence pertaining to the attempted murder of Richard Ferreira."). Nor has Ferreira set forth any evidence that he had any ownership interest in the Mercedes SUV described in the search warrant, which was registered to Flint. Id. at ¶ 115.

Where a movant-defendant "has suggested that competent evidence to prove the case is lacking, the burden devolves upon the non-moving plaintiff to document some factual disagreement sufficient to deflect *brevis* disposition." Wynne v. Tufts Univ. Sch. of Med., 976 F.2d

791, 793-94 1st Cir. 1992). "A non-moving party may not successfully defend against summary judgment where the evidence relied upon 'is merely colorable or is not significantly probative.'" Burke v. Town of Walpole, 405 F.3d 66, 76 (1st Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)). In other words, "the non-moving party cannot defeat summary judgment by mere allegations, but must bring 'sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975).

Here, Ferreira has submitted no evidence corroborating his unsupported statement that "Plaintiff had the total sum of $67,000.00, which cannot now, be found, nor accounted for by the Defendants." See SUF ¶ 165. Ferreira's claim that State Defendants "stole the money" and "lied about having it altogether" is a fictitious conspiracy theory, based purely on Plaintiff's own speculation. Id. at ¶ 166. Nothing in the record demonstrates Ferreira possessed $67,000.00, on or about April 29, 2016. See Wynne, 976 F.2d at 793-94. Even assuming *arguendo*, that Ferreira had $67,000.00 in his possession following the shooting, nothing in the record even suggests that State Defendants ever recovered or seized the alleged $67,000.00. Ferreira's "proof," therefore, consists solely of "conclusory allegations, improbable inferences, and unsupported speculation," which must be ignored at this stage. See Burke, 405 F.3d at 76 (quoting Roche v. John Hancock Mutual Life Ins. Co., 81 F.3d 249, 251 (1st Cir. 1996)). "The burden is on both parties to file necessary materials with the court to support their claims for and against summary judgment." Gen. Office Prods. Corp. v. A.M. Capen's Sons, 780 F.2d 1077, 1078 (1st Cir. 1986) (internal citations omitted).

Ferreira has failed to adduce how he is entitled to the $25,205.00 that was seized by RISP from the Mercedes SUV, pursuant to a warrant during a criminal investigation of the 2016

shooting. <u>See</u> SUF at ¶¶ 100-101, 121, 128-129. The record makes clear that State Defendants, armed with a valid search warrant, seized $25,205.00 from the Mercedes SUV, which was not registered to Ferreira. <u>See</u> SUF at ¶¶ 121, 151. The Mercedes SUV was registered to Flint at the time of the shooting, Flint's driver's license was found inside the vehicle during the search, and on August 5, 2016, RISP released the vehicle to Flint as the registered owner. <u>Id.</u> at ¶¶ 115-116, 123, 133.

Ferreira has set forth no evidence beyond his own unsupported speculation and cannot avoid "the swing of the summary judgment scythe." <u>See</u> Justiniano, 2021 WL 164975, at *10 (noting that the opposing party must "adduce specific facts showing that a trier of fact could reasonably find in his favor" and cannot rely on "conclusory allegations, improbable inferences, and unsupported speculation."). Absent competent evidence that State Defendants seized $67,000.00; or that Ferreira has any legal entitlement to the $25,205.00 that was seized pursuant to a search warrant by RISP from the Mercedes SUV, which Ferreira did not own, Ferreira's claims cannot survive summary judgment.

## II. PLAINTIFF'S SOLE FEDERAL CONSTITUTIONAL CLAIM, "LEGAL CLAIM #3", SHOULD BE DISMISSED BECAUSE IT IS BARRED AS A MATTER OF LAW AND STATE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

### A. Ferreira's "Claim #3" against State Defendants in their official capacities fails as a matter of law under <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58, 71 (1989)

Ferreira's "Claim #3" alleges that State Defendants' seizure of $25,505.00 in connection with an attempted murder investigation, violated Ferreira's constitutional rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution. <u>See</u> SUF at ¶ 161. Because these constitutional claims against State Defendants in their official capacities are the functional equivalent of a suit for damages against the sovereign, those claims fail as a matter

16

of law. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (holding that states are not

"persons" within the meaning of § 1983); see also Danny B. ex rel. Elliott, 784 F.3d at 834

(acknowledging the unavailability of money damages against the State in a § 1983 class action

against the Governor of Rhode Island and other official capacity only state defendants). Under §

1983:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress, except that in any action brought
> against a judicial officer for an act or omission taken in such officer's judicial
> capacity, injunctive relief shall not be granted unless a declaratory decree was
> violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (*emphasis added*). In Will v. Michigan, the Supreme Court solidified the

principle that plaintiffs may not maintain § 1983 claims against a state, because "neither a State

nor its officials acting in their official capacities are 'persons' under § 1983." 491 U.S. at 71.

Likewise, in Jones v. State of Rhode Island, this Court applied the Supreme Court's holding in Will

and held that "neither the State of Rhode Island nor any of its officials acting in their official

capacities, are 'persons' that can be held liable under § 1983." Jones v. State of R.I., 724 F. Supp.

25, 28 (D.R.I. 1989); see also Danny B. ex rel. Elliott, 784 F.3d at 834.

Here, Ferreira has filed a § 1983 claim against State Defendants in their official capacities,

seeking up to $5 million for alleged violations of Ferreira's First, Fourth, Fifth, Eighth, and

Fourteenth Amendments rights. See SUF at ¶ 161. Ferreira cannot maintain a § 1983 claim for

damages against RISP, because it is an agency of the State. See Will, 491 U.S. at 71. Moreover,

because Ferreira's § 1983 claims against Col. Manni, Lt. Grassel, Defendant Sgt. DeMarco, Sgt.

Baruti, and Trooper Hirsch, in their official capacities are the functional equivalent of a suit against

the sovereign, see Danny B. ex rel. Elliott, 784 F.3d at 834, Ferreira's claims fall outside the ambit of 42 U.S.C. § 1983. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). As such, Ferreira's claims against State Defendants in their official capacities fail as a matter of law and cannot survive summary judgment.

**B. Defendants Col. Manni and Trooper Hirsch were not involved in the investigation and should be dismissed as parties**

Defendants Col. Manni in his individual capacity, and Trooper Hirsch in her individual and official capacities, should be dismissed because neither Defendants Col. Manni nor Trooper Hirsch were involved in the investigation of the shooting in 2016. See SUF at ¶¶ 96-97. The Complaint alleges that Trooper Hirsch was "involved on April 29, 2016, in the actual investigation, and seizure of the SUV, where [Ferreira], had $67,000.00 stored within, which [State Defendants] seized/converted/stole, along with other personal effects of [Ferreira]…" and that Trooper Hirsch "was so poorly trained, funded, supervised in RISP policy/rules/regulations that these [Defendants] then located $25,996.00 (from the $67,000.00), and refused to return it to [Ferreira]". See SUF at ¶ 160. The Complaint alleges that Defendant Col. Manni "failed/refused to train, supervise, and/or create policy or suggest policy changes in relation the seizure of vehicles, which should have included … return of the $67,000.00…." Id. at ¶ 160.

As a preliminary matter, Ferreira sets forth no evidence that Defendant Trooper Hirsch was ever involved at any stage of the investigation of the shooting. To the contrary, it is clear from the record that Trooper Hirsch neither responded to the scene nor participated in any subsequent proceedings related to the investigation. Id. at ¶ 96-97. As such, the claims against Trooper Hirsch should be dismissed.

Viewing the Complaint in a light most favorable to Ferreira, the claims against Defendant Col. Manni fair no better under a supervisor liability theory. "Generally, a supervisor cannot be

held liable under § 1983 on a *respondeat superior* theory—a "supervisor's liability must be premised on his [or her] own acts or omissions" and does not attach automatically even if a subordinate is found liable." Justiniano v. Walker, No. 18-2015, 2021 WL 164975, at *5 (1st Cir. Jan. 19, 2021). In order to "connect the liability dots" a plaintiff must demonstrate "that one of the supervisor's subordinates abridged the plaintiff's constitutional rights" and that the supervisor's (in)action "was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as ... gross negligence amounting to deliberate indifference." Id. (quoting Guadalupe-Báez v. Pesquera, 819 F.3d 509, 515 (1st Cir. 2016)) (emphasis in original). To establish deliberate indifference in this context, the plaintiff must show: "(1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." Id. (citing Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1998)).

Even assuming *arguendo* that Ferreira could show a constitutional violation, which he cannot, as discussed *infra* in Section II(c), Ferreira cannot show Defendant Col. Manni participated in the investigation or acted with deliberate indifference in a supervisory capacity. Id. at ¶¶ 97-98. The record is clear that Defendant Col. Manni was retired from RISP at the time of the shooting in 2016 and was neither involved in the investigation of the shooting nor supervised the seizure of any evidence in 2016. Defendant Col. Manni rejoined the RISP as Superintendent in March 2019—well after any evidence was seized and after LPD suspended the investigation due to Ferreira's refusal to cooperate with detectives. Id. at ¶¶ 97-98, 135. As such, the claims against Defendant Col. Manni should be dismissed.

**C. Defendants Lt. Grassel, Sgt. DeMarco, and Sgt. Baruti are entitled to qualified immunity**

Ferreira's sole federal constitutional claim, "Legal Claim #3", alleges that State Defendants violated the First, Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States

Constitution by seizing $67,000.00. All State Defendants are entitled qualified immunity because Ferreira has produced no evidence, beyond his own improbable inferences and unsupported speculation, that any of State Defendants ever seized $67,000. Further, the $25,205.00 was seized pursuant to a valid warrant issued in connection with an attempted murder investigation. Ferreira has not offered any competent evidence that would overcome State Defendants' qualified immunity.

Qualified immunity is more than a mere defense to § 1983 liability, it provides defendant public officials with immunity from suit. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985); see also Guzman-Rivera v. Rivera-Cruz, 98 F.3d 664, 666 (1st Cir. 1996) ("The qualified immunity defense exists not only to shield officials from liability for damages, but also to protect them from 'the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service.'"). Importantly, "because '[t]he entitlement is an *immunity from suit* rather than a mere defense to liability,' the First Circuit has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (*emphasis in original*).

Qualified immunity leaves "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." Bilida v. McCleod, 211 F.3d 166, 174 (1st Cir. 2000). "Qualified immunity protects an officer from suit when a reasonable decision in the line of duty ends up being a bad guess—in other words, it shields from liability 'all but the plainly incompetent or those who knowingly violate the law.'" Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 22 (1st Cir. 2016); Harlow v. Fitzgerald, 457 U.S. 800 (1982) (noting that qualified immunity precludes suits for money damages against state officials "insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). The First Circuit employs a two-step analysis to determine whether a public official is entitled to qualified immunity. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) ("[W]e now adopt the Court's two-part test and abandon our previous usage of a three-step analysis."); see also Justiniano v. Walker, No. 18-2015, 2021 WL 164975, at *10 (1st Cir. Jan. 19, 2021). As such, the court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and, (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation. Maldonado, 568 F.3d at 269 (citing Pearson v. Callahan, 555 U.S. 223 (2009)). Furthermore, the second step has two aspects: (a) one focusing on the clarity of the law at the time of the alleged civil rights violation and (b) the other focusing more concretely on the facts of the particular case and whether a reasonable defendant would have understood that the conduct violated the plaintiff's constitutional rights. Id. (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

The State will address each constitutional amendment in turn, with respect to Ferreira's § 1983 claim.

### i. First Amendment — Lt. Grassel, Sgt. DeMarco, and Sgt. Baruti are entitled to qualified immunity because Ferreira has not shown their conduct restricted a constitutionally protected speech activity

The Complaint alleges that State Defendants violated Ferreira's "right of expression, when [Plaintiff] lacked the financial ability to express himself thru [sic] the purchase of items that reflected his political, religious, and sexual views, using the $67,000.00, or [$25,205.00]" as well as his right to association because he "lacked the financial ability to socialize with other people, and spend his money as he saw fit within the limits of the law…." See SUF at ¶ 161.

As a preliminary matter, Ferreira has not submitted any evidence demonstrating the

existence of the alleged $67,000.00, or that State Defendants ever took custody of such, or that

Ferreira has any legal entitlement to the $25,205.00 that RISP seized pursuant to a validly issued

warrant from a vehicle that was registered and owned by another person. Id. at ¶¶ 121, 128-129.

Nevertheless, the First Amendment protects speech; not one's wallet. See U.S. Const. amend. I.

The First Amendment provides that:

> Congress shall make no law respecting an establishment of religion, or prohibiting
> the free exercise thereof; or abridging the freedom of speech, or of the press; or the
> right of the people peaceably to assemble, and to petition the Government for a
> redress of grievances.

U.S. Const. Amend. I. Ferreira cannot demonstrate that the lawful seizure of $25,205.00, pursuant

to a valid warrant, unconstitutionally restricts Ferreira from engaging a protected speech activity.

As such, State Defendants are entitled to qualified immunity.

> ### ii.     *Fourth Amendment — Lt. Grassel, Sgt. DeMarco, and Sgt. Baruti are entitled to qualified immunity because Ferreira has not established that their conduct denied Ferreira due process of law*

It is unclear, but Ferreira appears to allege that the seizure of "the $67,000.00, and personal

effects (i.e., personal papers, clothing, etc) from the SUV" violated Plaintiff's Fourth Amendment

rights. Id. at ¶ 161. The Complaint does not provide a basis for the alleged Fourth Amendment

violation.

The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects,
> against unreasonable searches and seizures, shall not be violated, and no Warrants
> shall issue, but upon probable cause, supported by Oath or affirmation, and
> particularly describing the place to be searched, and the persons or things to be
> seized.

U.S. Const. amend IV. "The primary purpose of the Fourth Amendment is to prevent arbitrary and

oppressive interference by enforcement officials with the privacy and personal security of

individuals." United States v. Ford, 548 F.3d 1, 4 (1st Cir. 2008) (internal quotes omitted); United

States v. Proctor, 148 F.3d 39, 41 (1st Cir. 1998) ("[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate are per se unreasonable under the Fourth Amendment—subject only to a few specially established and well delineated exceptions.") (internal quotes omitted). In general terms, the Fourth Amendment protects against warrantless searches and seizures, "subject only to a few specifically established and well-delineated exceptions." See Katz v. United States, 389 U.S. 347, 357 (1967).

Ferreira has offered no competent evidence that State Defendants recovered or seized $67,000.00 from the crime scene. Moreover, the $25,205.00 was lawfully seized by RISP as evidence, pursuant to a valid search warrant issued in connection with a criminal investigation.[15] See SUF at ¶¶ 119, 121, 128-129. The warrant issued on April 29, 2016 by Chief Judge Jeanne E. LaFazia in connection with the investigation of the shooting, authorized RISP to perform a search of the following and seize the following:

> Place or person to be searched: 2005 Mercedes Benz, ML350, color gray, vehicle identification number 4JGAB57E15A543741 Massachusetts registration 2NX159
>
> Property or articles to be searched for: Firearms, ammunition, clothing, cellular phones, multimedia devices, gunshot residue, biological evidence, US currency and receipts, and any and all evidence pertaining to the attempted murder of Richard Ferreira, DOB [redacted]
>
> Name of owner, keeper, thereof if known to complainant: Charles Flint, DOB [redacted]

Id. at ¶¶ 119. As such, Ferreira's claims against Defendants Lt. Grassel, Sgt. DeMarco, and Sgt. Baruti in their individual capacities fail at the outset, because the RISP inventory records demonstrate that the $25,205.00 and Mercedes SUV were seized pursuant to a valid search

---

[15] Plaintiff appears to concede that the $25,205.00 that RISP recovered from the SUV was lawfully seized and does not contest the validity of the warrant. See SUF at 164 ("The money was taken by legal warrant it would appear….").

warrant, issued by the Chief Judge of the Rhode Island District Court, in connection with a criminal investigation directly involving Ferreira and several others. Id. Furthermore, the warrant itself expressly provided for the seizure of "US currency" from the "2005 Mercedes Benz, ML350" that was registered to Charles Flint. Id. at ¶¶ 115, 119. In the absence of any evidence to the contrary, Ferreira cannot demonstrate that the lawful seizure of U.S. currency by RISP constitutes a violation of Ferreira's Fourth Amendment rights and State Defendants are entitled to qualified immunity.

   iii.   *Fifth Amendment — Lt. Grassel, Sgt. DeMarco, and Sgt. Baruti are entitled to qualified immunity because Ferreira has not shown that they were federal actors*

   The Complaint alleges that RISP's "refusal to return" the $25,205.00 that was seized from the SUV, violates Ferreira's Fifth Amendment right to due process. Id. at 161. The Complaint does not provide a basis for the alleged Fifth Amendment violation. The Fifth Amendment provides that:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. Const. amend V. To set forth a § 1983 claim for deprivation of property under the Fifth Amendment, a plaintiff must allege some action taken by the federal government. Schweiker v. Wilson, 450 U.S. 221, 227 (1981) (Noting that the Fifth Amendment only applies to actions taken by the federal government, not state or local governments); Martinez-Rivera v. Ramos, 498 F.3d 3, 8-9 (1st Cir. 2007). Because Ferreira neither shows nor even alleges that any of State Defendants in this matter are federal actors, Ferreira cannot make out a violation of his Fifth Amendment rights. See Maldonado v. Fontanes, 568 F.3d at 269. As such, State Defendants are entitled to

qualified immunity.

> iv.     *Eighth Amendment — Lt. Grassel, Sgt. DeMarco, and Sgt. Baruti are entitled to qualified immunity because Ferreira has not shown they acted with deliberate indifference*

The Complaint alleges that State Defendants violated Ferreira's Eight Amendment "right to be free from cruel and unusual punishment" by seizing the $25,205.00 and "forcing the [Ferreira] into a mental anguish nightmare of litigation." See SUF at ¶ 161. Ferreira's Eighth Amendment claim is without merit.

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend VIII. To set forth a § 1983 claim for cruel and unusual punishment under the Eighth Amendment, a plaintiff must show that the deprivation was objectively "sufficiently serious" and the defendants conduct was subjectively performed with the requisite culpability; *i.e.*, deliberate indifference. Kosilek v. Spencer, 774 F.3d 63, 85 (1st Cir. 2014). "This standard, requiring an actual, subjective appreciation of risk, has been likened to the standard for determining criminal recklessness." Giroux v. Somerset Cty., 178 F.3d 28, 32 (1st Cir. 1999). Like criminal recklessness, deliberate indifference requires a person to "consciously disregar[d] a substantial risk of serious harm."). Id. (citing Model Penal Code § 2.02(2)(c)).

The Complaint provides no basis whatsoever for how the Eighth Amendment applies to Ferreira's claims. See SUF at ¶ 161. In any event, Ferreira's vague allegation of "mental anguish" is neither supported by any evidence or expert testimony, nor does it rise to the level of a serious medical issue for Eighth Amendment purposes. Id.; see also Kosilek, 774 F.3d at 85 (citing Thomas v. Bryant, 614 F.3d 1288, 1307 (11th Cir. 2010) ("Whether the record demonstrates that [the prisoner] was sprayed with chemical agents ... and that he suffered psychological injuries from

25

such sprayings are questions of fact. Whether these deprivations are objectively 'sufficiently serious' to satisfy the objective prong, is a question of law....") (internal citations omitted)). Furthermore, Ferreira has failed to set forth any evidence whatsoever that would show any of State Defendants acted with deliberate indifference towards Ferreira.[16] In the absence of any evidence to the contrary, Ferreira cannot demonstrate that the lawful seizure of $25,205.00 by State Defendants violates his Eighth Amendment rights. As such, State Defendants are entitled to qualified immunity.

>    ***v.  Fourteenth Amendment — Lt. Grassel, Sgt. DeMarco, and Sgt. Baruti are entitled to qualified immunity because Ferreira has not shown an equal protection violation***

The Complaint alleges that the seizure of "personal effects and $67,000.00, in cash" from the SUV violates Ferreira's Fourteenth Amendment equal protection rights. See SUF at ¶ 161. Ferreira's equal protection claim is utterly without merit.

The Fourteenth Amendment provides that:

> All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend XIV sec. 1. In essence, the Equal Protection Clause requires that "all persons similarly situated ... be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439

---

[16] While the Supreme Court has recognized that the Excessive Fines Clause of the Eighth Amendment "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense[,]'" State Defendants have not instituted any forfeiture proceedings with respect to any of the cash seized in connection with the attempted murder investigation. See United States v. Bajakajian, 524 U.S. 321, 328 (1998) (recognizing that criminal forfeiture of currency at the culmination of a federal criminal proceeding constitutes a "fine" and is subject to the Eighth Amendment.); see also SUF at ¶ 144. As such, the excessive fines clause of the Eighth Amendment has no application to the instant case.

(1985); <u>Tapalian v. Tusino</u>, 377 F.3d 1, 5 (1st Cir. 2004). To establish a plausible equal protection claim, a plaintiff not relying on typically impermissible bases for classification (e.g., race, religion, etc.) must show that it was "intentionally treated differently from others similarly situated, that no rational basis exist[ed] for that difference in treatment, and that the different treatment was based on a malicious or bad faith intent to injure." <u>Rocket Learning, Inc. v. Rivera-Sanchez</u>, 715 F.3d 1, 10 (1st Cir. 2013) (quoting <u>Buchanan v. Maine</u>, 469 F.3d 158, 178 (1st Cir. 2006)).

In the instant matter, Ferreira neither shows nor even alleges that he was treated differently from others similarly situated or that Defendants Lt. Grassel, Sgt. DeMarco, and Sgt. Baruti acted with malicious intent or bad faith. <u>See</u> SUF at ¶¶ 160-161. Because Ferreira neither shows nor alleges that any of State Defendants in this matter acted with malicious intent and treated Ferreira differently than others similarly situated, Ferreira's Fourteenth Amendment equal protection claim fails, and State Defendants are entitled to qualified immunity.[17]

---

[17] To the extent that the Second Amended Complaint purports to allege due process violations, Plaintiff has failed to set forth any evidence that he is entitled to properly seized evidence in a criminal investigation. Moreover, Plaintiff has not been denied any legal such process. To date, it does not appear that Plaintiff has petitioned the Rhode Island District Court or Rhode Island Superior Court, to seek release of any of the seized money, as provided under Rhode Island law and consistent with the warrant issued in the criminal investigation. <u>See</u> SUF at ¶ 119. Under Rhode Island law:

> All property, money, or estate taken or detained as evidence in any criminal cause shall be subject to the order of the court before which the indictment, information, or complaint shall be brought or pending, and shall, at the termination of the cause, be restored *to the rightful owner*.

R.I. Gen. Laws § 12-17-6 (*emphasis added*); <u>see also</u> R.I. Gen. Laws § 21-28-5.04.2(d) (providing that property seized pursuant to a legally authorized search warrant "shall not be subject to sequestration or attachment but is deemed to be in the custody of the law enforcement agency making the seizure, *subject only to the order of the court*.") (*emphasis added*); R.I. Gen. Laws § 12-5-7(a) ("The property seized shall be safely kept by the officer seizing it, under the direction of the court, *so long as may be necessary* for the purpose of being used as evidence in any case.") (*emphasis added*); <u>see also e.g.</u>, R.I. D. Ct. R. Crim. P. 41(g) ("In no event shall property which is otherwise subject to lawful detention be ordered returned); R.I. Super. Ct. R. Crim. P. 41(g) (same).

**III.    PLAINTIFF'S STATE CLAIMS SHOULD BE DISMISSED BECAUSE STATE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY AND PLAINTIFF FAILS TO STATE A CLAIM**

To the extent that the Court dismisses Ferreira's federal claims, Legal Claim #3, State Defendants respectfully request that the Court decline to extend supplemental jurisdiction over Ferreira's state law claims, consisting of Legal Claim #1, Legal Claim #2, Legal Claim #4, and Legal Claim #5. See 28 U.S.C. § 1367(c); see also Zell v. Ricci, 957 F.3d 1, 15 (1st Cir. 2020) ("[I]t can constitute an abuse of discretion—if no federal claim remains to which the state-law claims can be tethered—"for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state courts."); see also Wilber v. Curtis, 872 F.3d 15, 23 (1st Cir. 2017). In the event that the Court exercises supplemental jurisdiction, Ferreira's remaining state law claims, should be dismissed. State Defendants will address each claim in turn.

**A.  State Defendants are entitled to qualified immunity with respect to Ferreira's remaining state law claims**

Ferreira's remaining state law claims, "Legal Claim #1", "Legal Claim #2", "Legal Claim #4", and "Legal Claim #5", are grounded in his federal constitutional claims, "Legal Claim #3". See SUF at ¶¶ 161. Because State Defendants are entitled to qualified immunity with respect to

---

To this end, Plaintiff's underlying claims are not ripe and should be dismissed for lack of subject matter jurisdiction, because RISP seized the money at issue, in connection with a criminal investigation, and pursuant to a valid search warrant. See SUF at ¶ 119; cf also State v. Rushlow, 72 A.3d 868, 870 (R.I. 2013) (recognizing that where property is seized in connection with a criminal charge that has since been dismissed, the Attorney General must be afforded an opportunity to present competent legal evidence in a state criminal matter, so the court "may determine whether the government has any right to retain the seized property" and if not, identify the rightful owner to whom the seized property should be returned); State v. Shore, 522 A.2d 1215, 1217 (R.I. 1987) ("As well, the government must show that the property is necessary to the success of an active criminal investigation, is going to be used as evidence in a pending criminal trial, or is subject to forfeiture.").

Ferreira's federal constitutional claims, as discussed *supra* in Section II(B), State Defendants are also entitled to qualified immunity with respect to the state law claims. <u>See</u> SUF at ¶¶ 161; <u>see also</u> <u>Estrada v. Rhode Island</u>, 594 F.3d 56, 63 (1st Cir. 2010) (citing <u>Hatch v. Town of Middletown</u>, 311 F.3d 83, 89-90 (1st Cir. 2002) (finding an officer was entitled to qualified immunity under federal law was also entitled to qualified immunity for same claim under Rhode Island law)); <u>Ensey v. Culhane</u>, 727 A.2d 687, 690 (R.I. 1999); <u>Pontbriand v. Sundlun</u>, 699 A.2d 856, 867 (R.I. 1997). "<u>Ensey</u> and <u>Pontbriand</u> reflect Rhode Island's recognition of a qualified immunity defense under state law analogous to the federal doctrine established by the United States Supreme Court in <u>Harlow</u>, cited with approval in both Rhode Island decisions, and routinely applied in § 1983 cases." <u>Hatch</u>, 311 F.3d at 90 (internal citations omitted).

Furthermore, because State Defendants in their individual capacities are immune from suit on the state law claims, so too is the State. <u>Gray v. Derderian</u>, 400 F. Supp. 2d 415, 424 (D.R.I. 2005) (no "If no liability can be charged against [a State employee], then no *respondeat superior* liability can be charged to the State"); <u>DiQuinzio v. Panciera Lease Co.</u>, 612 A.2d 40, 43 (R.I. 1992) (because operator of vehicle immune from suit pursuant to exclusivity provision of Workers' Compensation Act, there could be no cause of action against vehicle owner); <u>cf also</u> <u>Morales v. Town of Johnston</u>, 895 A.2d 721, 728-29 (R.I. 2006) (where high school soccer coaches have statutory immunity from suit, school district cannot be held liable based upon same conduct).

## B. Ferreira's "Legal Claim #1" fails to state a claim for tortious interference with business relations

Ferreira's "Legal Claim #1" claims that State Defendants violated R.I. Gen. Laws § 21-28-5.04.1, which governs procedures for forfeiture of property and money for violations of the Uniform Controlled Substances Act, as well as 21 U.S.C. §§ 853(a) and 881(d) and 19 U.S.C. § 1615, which govern similar forfeiture proceedings under federal law. <u>See</u> SUF ¶ 161. None of

these statutes are applicable to State Defendants in this matter. As detailed *supra* with respect to Ferreira's federal claims, no forfeiture proceedings are pending at present with respect to any of the cash seized in connection with the attempted murder investigation. Id. at ¶ 144. In lieu of a forfeiture proceeding, R.I. Gen. Laws § 21-28-5.04.1 still does not provide for a private cause of action. Tarzia v. State, 44 A.3d 1245, 1258 (R.I. 2012) ("When a statute does not plainly provide for a private cause of action [for damages], such a right cannot be inferred.") (alteration in original) (internal quotation marks omitted). Finally, the federal statutes Ferreira invokes provide for forfeiture of property "to the United States." 21 U.S.C. § 853(a); see also 21 U.S.C. § 881(a). Because Ferreira cannot sustain a cause of action under any of the foregoing statutes, summary judgment should enter for State Defendants, with respect to "Legal Claim #1."

### C. Ferreira's "Legal Claim #2" fails to state a claim for tortious interference with economic advantage

The Complaint describes "Legal Claim #2" as a "Tort of Negligence Action-Claim of Financial Interference." See SUF ¶ 161. Ferreira elaborates by alleging that State Defendants "interfered with [his] right to gamble, and/or have money, and/or spend his money as he saw fit…." Id. This claim appears to most closely resemble one for tortious interference with prospective economic advantage; to recover for such a claim, a plaintiff must show "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an intentional [and improper] act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." Beauregard v. Gouin, 66 A.3d 489, 496 (R.I. 2013) (alteration in original) (quoting Avila v. Newport Grand Jai Alai LLC, 935 A.2d 91, 98 (R.I. 2007)).

Ferreira's "Legal Claim #2" fails at every step of this inquiry. First, Ferreira has not shown the existence of a business relationship or expectancy. Evidence of a "reasonably anticipated

contractual relationship would suffice, provided there is also shown a then present knowledge of that expected relationship on the part of the plaintiff." Bogosian v. Lynch, No. C.A. NO. P.C. 87-118, 1992 WL 813496, at *4 (R.I. Super. Jan. 22, 1992), aff'd and remanded, 624 A.2d 1104 (R.I. 1993) (emphasis added). In his Complaint, Ferreira refers only to his general ability "to gamble, and/or have money, and/or spend his money as he saw fit"; he has provided no evidence of any specific business or contractual relationship of which he was aware on April 29, 2016, and he has likewise presented no evidence that State Defendants knew of any such relationship. See SUF at ¶ 161. Most importantly, "there must be proof that the interference caused the damages." Bogosian, 1992 WL 813496, at *4. Ferreira can present no such proof. As such, summary judgment should enter for State Defendants, with respect to "Legal Claim #2."

**D. Ferreira's "Legal Claim # 4" and "Legal Claim #5" fail to state a claim for conversion**

Ferreira alleges in "Legal Claim #4" and "Legal Claim #5" that State Defendants converted "personal effects and $67,000.00" from inside the SUV. See SUF at ¶ 161. In an action for conversion under Rhode Island law, "[a] plaintiff must establish that [he or she] was in possession of the personalty, or entitled to possession of the personalty, at the time of conversion." Narragansett Elec. Co. v. Carbone, 898 A.2d 87, 97 (R.I. 2006) (citing Montecalvo v. Mandarelli, 682 A.2d 918, 928 (R.I. 1996)). In such action, the Court must focus its inquiry on "whether the defendant has appropriated to his own use the chattel of another without the latter's permission and without legal right." Richer v. Parmelee, 388 F. Supp. 3d 97, 108 (D.R.I. 2019); McLaughlin v. deMedeiros, No. CV 16-648-JJM-PAS, 2020 WL 1492991, at *6 (D.R.I. Mar. 27, 2020).

Ferreira's conversion claims fail from the start because Ferreira has not established that RISP seized $67,000.00. See Narragansett Elec. Co., 898 A.2d at 97. Ferreira has further failed

to show how he is entitled to possess the unspecified "personal effects" that were lawfully seized, pursuant to a validly issued warrant in a state criminal investigation. <u>See</u> SUF at ¶ 119; <u>see also</u> <u>Richer v. Parmelee</u>, 388 F. Supp. 3d 97, 108 (D.R.I. 2019). As such, because Ferreira cannot show prior possession of the alleged $67,000.00 or a present entitlement to evidence seized in a criminal investigation, summary judgment should enter for State Defendants, with respect to "Legal Claim #4" and "Legal Claim #5".

## **CONCLUSION**

**WHEREFORE**, State Defendants respectfully request that this Honorable Court their Motion and enter summary judgement in favor of State Defendants.

Respectfully Submitted,

RHODE ISLAND STATE POLICE;
COLONEL JAMES MANNI, in his
individual capacity and official capacity as
Superintendent of the Rhode Island State
Police; DETECTIVE LIEUTENANT JOHN
GRASSEL; DETECTIVE SERGEANT
KENNETH DEMARCO; SERGEANT
SCOT BARUTI; and, TROOPER
KATHERYN HIRSCH, in their individual
and official capacities,
By:

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ Justin J. Sullivan*

Justin J. Sullivan (#9770)
Special Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
150 South Main St. Providence, RI 02903
Tel: (401) 274-4400 | Ext. 2007
Fax: (401) 222-2995
jjsullivan@riag.ri.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed the within document via the ECF filing system and that a copy is available for viewing and downloading. I have also caused a copy to be sent via the ECF system to the following attorneys of record on Friday, January 29, 2021:

Marc DeSisto, Esq.
marc@desistolaw.com

Patrick K. Burns, Esq.
pburns@desistolaw.com

*/s/ Ellen Ullucci*

I, hereby further certify, that I mailed a copy of the foregoing document by first class mail, postage prepaid on Friday, January 29, 2021 to:

Richard Ferreira,
*Pro Se - Incarcerated*
45 Dover Street
Fall River, MA 02721
774-379-3621

*/s/ Taylor O'Brien*